UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MARY GODWIN, | ) | |
| | ) | |
|     Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:12-cv-03752-WSD |
| v. | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| WELLSTAR HEALTH | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

## I.    INTRODUCTION

"At your age, why are you still working?"  Cherise Brown, Mary Godwin's new supervisor, posed this question after asking Godwin point blank how old she was.  Godwin was, at the time, 63 years old.  She had worked for WellStar Health Systems, Inc. ("WellStar") for over a decade and as a Buyer for at least eight years.  Cherise Brown, newly hired and in her 30s, was determined to put an end to that and, in Brown's words, put Godwin "out to pasture."  At the time, Godwin's husband was very ill.  Brown told Godwin, "at your age, I would think you would want to be home taking care of your husband."  Lamenting that Godwin was still working, Brown lectured: "you should have made provision for being out of work when you were younger."  And Brown implied that Godwin's age was impairing her acumen, saying that she was not "mentally capable of understanding" Brown.

Brown's abuse of Godwin was also physical.  Godwin has rheumatoid arthritis, osteoporosis and fibromyalgia.  Because of these conditions, and pursuant to doctor's orders, Godwin must not stay seated for more than an hour at a time.  She asked Brown to allow her to periodically get up and walk.  Brown prevented her from doing so, demanding that Godwin seek permission before leaving her desk, even to use the restroom.  When Godwin asked Brown what she should do if Brown was not around to ask permission, Brown said: "just deal with it."  "Just

1

deal[ing] with it" caused Godwin to "sit there until [she] almost could not get up," to endure "excruciating pain," and back and knee swelling necessitating cortisone shots.

Godwin made two complaints to Human Resources about Brown's discriminatory treatment. The second, more substantial, complaint was on May 4, 2011. Godwin complained about age discrimination, described the discriminatory comments, and detailed the denial of her accommodation requests. Brown was promptly informed about Godwin's complaint. On May 9, 2011, Godwin had a follow-up interview with HR. <u>That day</u>, knowing that the interview was taking place, Brown recommended that Godwin be terminated.

HR investigated and interviewed Brown and other members of the department. Brown admitted asking Godwin why she was still working at her age. One interviewee, Lynn Bryant, reported that Brown was "targeting" Godwin. Another, June Carpenter, a 25-year employee of WellStar, said that Brown was discriminating against *her* due to her age. On May 23, 2011, HR concluded (somehow) that Godwin's claims were unsupported. On June 17, 2011, Brown again recommended that Godwin be terminated. On June 22, 2011, Brown called Godwin into a meeting and told her she was fired. In that meeting, Brown, who

knew Godwin was caring for her dying husband, smiled and said, "oh, by the way, your insurance will cancel at the end of the month."

Backing slowly away from Brown's toxic behavior, Defendant trots out Tony Trupiano as the "decisionmaker" for Godwin's termination. This is a dodge. Trupiano had two degrees of separation from Godwin. Godwin reported to Brown, who reported to Ken Tifft, who reported to Trupiano. Trupiano did not have daily interaction with Godwin, did not directly oversee her work, admitted that he would not have terminated Godwin *but for* Brown's recommendation, and conceded that (1) Brown provided him with all documents he relied upon in approving the termination, and (2) he did not independently investigate the completeness or accuracy of Brown's information. Brown's discriminatory and retaliatory animus was the "but for" cause of Godwin's termination.

Defendant claims that it terminated Godwin for making purchasing errors. But Defendant's witnesses admitted that all buyers make these errors, that the errors are regularly made, and none could say how many more errors, if any more, Godwin made than other buyers. Ken Tifft, Brown's supervisor, who allegedly "approved" Godwin's termination after solely talking with Brown (while out recovering from surgery), supervised Godwin directly for months prior to hiring Brown. During that time, Tifft thought Godwin was "meeting expectations" and

gave her two raises in six months (November 2009 to April, 2010).  Tifft admitted

that he never wanted to terminate, or even discipline, Godwin before Brown

arrived.

Godwin asserts claims for discrimination and retaliation under the Age

Discrimination in Employment Act ("ADEA") and claims for denial of

accommodation and retaliation under the Americans with Disabilities Act

("ADA").  There is more than sufficient evidence for a jury to find for Godwin on

these claims and Defendant's motion should be denied in its entirety.

## II.   RELEVANT FACTS

### A.   Godwin's Career At WellStar Before Ken Tifft

Mary Godwin was born in 1948.  Godwin Dep. at 8.  Her employment with

WellStar began in 1999.  *Id.* at 9.  She was originally hired as an Order Puller, and

received two promotions, first to Lead Order Puller, then to Buyer.  *Id.* at 16-17.

She held the Buyer position from at least as early as 2003 continuously until her

June 22, 2011 termination.  *Id.* at 27-28.  From 2003 to June 2007, Godwin met or

exceeded the expectations for the Buyer position.  Tifft Dep. at 22-25, 28 & Dep.

Ex. 1, 2, 3, 4.  Godwin's supervisor during that period was Roger Williams.

Godwin Dep. at 15, 19, 21.  Williams reported to Jeff Stephens, (*Id.* at 14-15),

who was married to Godwin's step-daughter.  *Id.* at 13-15, 25.

4

In or around 2008, Stephens and Godwin's step-daughter initiated divorce proceedings because Stephens began an "office affair" with another WellStar employee.  *Id.* at 45-46.  In August 2008, Godwin received a performance review directly from Stephens for the first time, rating her as unsatisfactory overall.  Betts Dep. at 39-40 & Dep. Ex. 6.  Kristen Betts (Human Resources) testified that it was not appropriate for Stephens to review Godwin.  *Id.* at 38.  A few months later, Chris Holihan, the new Manager of Purchasing, performed an atypical off-cycle review for Godwin, and changed her rating to meets expectations, resulting in a pay increase.  *Id*. at 41-44.

**B.     Godwin Thrives Under Ken Tifft.**

Trupiano hired Tifft in September or October 2009.  Tifft Dep. at 32-33; Trupiano Dep. at 18.  Godwin started reporting to Tifft.  *Id.*  On November 11, 2009, Tifft executed a "Turn Around Document" for Godwin retroactively approving a merit raise.  Tifft Dep. at 29-31 & Dep. Ex. 6.  On April 2, 2010, Betts sent an email reflecting Tifft's evaluation of Godwin:

> Ken is concerned about Mary Godwin specifically.  …  Based on what Ken has seen and knows about Mary's performance over the last few months, he feels . . . she is meeting expectations, and that she was not evaluated fairly or correctly by Chris and previous management.

*Id.* at 33-36 & Dep. Ex. 8.    Tifft put through a second raise for her, and increased her pay by over 30% (from $13.92 to $18.51 an hour).  *Id*. at 36-37.

**C.     Brown Arrives And, Within Months, Puts Godwin On A PIP And Subjects Her To Discriminatory And Abusive Questions And Comments.**

In March or April 2010, Tifft hired Brown as the new Purchasing Manager. Tifft Dep. at 39-40.  Brown was 36 years old.  Brown Dep. at 12.  Brown reported to Tifft, and Godwin started reporting to Brown.  Tifft Dep. at 39-40, 59.[1]  On September 8, 2010, Brown put Godwin on a 90-day Performance Improvement Plan ("PIP").  *Id.* at 56 & Dep. Ex. 15.  Prior to Brown becoming Godwin's supervisor, Godwin had never before been put on a PIP and had never before been disciplined.  *Id.* at 62; Declaration of Mary Godwin ("Godwin Decl.") at ¶ 3 (Attached as Exhibit A).  Brown administered 30 and 60 day follow-ups on the PIP, but never completed the 90 day follow-up.  Godwin Dep. at 154-155 & Dep. Ex. 14-15; Tifft Dep. at 70.  Brown testified that she did not know whether Godwin had successfully completed the PIP.  Brown Dep. at 75-76. Godwin was never informed one way or the other.  Godwin Dep. at 155-156.[2]

During this time period, Godwin received a great deal of positive feedback from people inside and outside of WellStar.  Tifft Dep. at 75.  Nevertheless, Brown remained intensely critical of Godwin.  She told Godwin repeatedly that Godwin

---

[1] Tifft reported to Trupiano.  Godwin Dep. at 59.
[2] Betts testified that a manager who administers a PIP should tell the employee whether it has been completed successfully.  Betts Dep. at 70.

was not "mentally capable of understanding" her. Godwin Dep. at 76, 109, 179. Brown made it very clear that she attributed Godwin's perceived mental deficiencies to Godwin's advanced age. She asked Godwin point blank how old she was. Betts Dep. at 115-116; Godwin Dep. at 136. When Godwin revealed that she was 63, Brown asked: "at your age, why are you still working?" Betts Dep. at 87, 115-116; Godwin Dep. at 74-75; Tifft Dep. at 98.[3] When Godwin said she needed the income, Brown chastised her, telling her that she "should have made provision for being out of work when she was young." Godwin Dep. at 74-75, 109. According to Brown, at Godwin's age, she should be "home taking care of her husband." *Id*. at 74-75, 108, 109.[4] It was time, according to Brown, that Godwin be "put out to pasture." *Id*. at 89. Tifft conceded that the intent of "putting someone out to pasture" would be to force retirement. Tifft Dep. at 102.

Tifft counseled Brown about making ageist comments and said Brown "knew she messed up." *Id.* at 101.[5] Brown conveyed to Tifft that she did not think

---

[3] Tifft testified that, if his supervisor asked him why he was still working at his age, "it's a little bit of a red flag." Tifft Dep. at 98-99.

[4] At the time, Godwin's husband was very ill. Godwin Decl. at ¶ 7; Godwin Dep. at 171-172. Godwin worked from 5:00 am to 3:00 pm and arranged for someone to be with her husband until 3:00 pm. Godwin Dep. at 171-172. After Godwin complained about Brown, Brown gave her work immediately before 3:00 pm and told her she could not leave until she finished, leaving Godwin with "nobody to stay with her husband." *Id*.

[5] Brown denies this counseling happened. Brown Dep. at 40-41.

Godwin could do the job. *Id.* at 104-105.  This was a direct departure from Tifft's own analysis of Godwin: as of April 2010 he thought Godwin was meeting expectations. *Id.* at 36, 61, 106.  It was only after Brown arrived that Godwin suddenly was not up to par. *Id.* at 106.  Tifft never wanted to put Godwin on a PIP, discipline Godwin, or terminate Godwin before Brown arrived. *Id.* at 158-159.

On February 24, 2011, Brown put Godwin on a second 90-day PIP. *Id.* at 75 & Dep. Ex. 26.  This second PIP faulted Godwin for alleged problems with purchase orders, reported savings, team participation, "excessive time away from desk" and internet use. Godwin Dep. at Ex. 16.

### D.      Brown Willfully Refuses To Accommodate Godwin.

Godwin has rheumatoid arthritis, osteoporosis and fibromyalgia.  Godwin Dep. at 78.  Because of these conditions, Godwin cannot stay seated for extended periods and must get up and walk around periodically. *Id.*  Brown knew that Godwin had rheumatoid arthritis and osteoporosis.  Brown Dep. at 82.  Brown told Godwin that she did not want Godwin to get up from her desk, and that she was not permitted to leave her desk or use the restroom without Brown's permission.  Godwin Dep. at 81-83.  On or about February 25, 2011, Godwin submitted a doctor's note to Brown supporting her accommodation request, stating that Godwin could not be seated for more than an hour. *Id.* at 80-81 & Dep. Ex. 10;

8

Tifft Dep. at 79 & Dep. Ex. 27; Brown Dep. at 61, 82-83.  Godwin also submitted the note to Tifft.  *Id.*  Betts (HR) conceded that taking a short walk about once an hour is a reasonable accommodation.  Betts Dep. at 72.

Brown, however, even after receiving the doctor's note, still required Godwin to obtain her permission before leaving her desk or using the restroom. Godwin Dep. at 80-87, 90, 94-97.[6]  When Brown was not around for Godwin to ask permission, Brown told Godwin to just "deal with it."  *Id.* at 180.  In some instances, Brown told Godwin expressly that she could not leave her desk.  *Id.* at 98.  Staying seated longer than she should caused Godwin "excruciating pain."  *Id.* at 154-155.  She remained seated until she "almost could not get up," her back and knees swelled and she needed cortisone shots.  *Id.* at 180.

HR knew about the requested accommodation, but took no steps to ensure that Brown was accommodating Godwin other than to ask Brown if she was.  Betts Dep. at 79-80.  When Brown was asked what steps she took to ensure that Godwin was accommodated, she testified "Directly, none."  Brown Dep. at 83.  Brown had no interactive dialogue with Godwin concerning her disabilities and how she could accommodate them.  *Id.* at 84.

---

[6] Tifft does not think the requirement to seek permission to go to the bathroom is reasonable, as "we're not in elementary school."  Tifft Dep. at 81.

**E.     Godwin Complains Repeatedly To Tifft; Tifft's Sole Response To Godwin Is "Just Keep Doing What You're Doing."**

Godwin complained to Tifft about Brown's treatment of her "maybe a half dozen times."  Tifft Dep. at 93-94.  Godwin complained to Tifft that Brown was discriminating against her based on her age, did not like her, and was singling her out.  Godwin Dep. at 73-75; Tifft Dep. at 111.  Tifft said "just keep doing what you're doing."  Godwin Dep. at 75.

**F.     March 29, 2011: Godwin Complains To HR and HR Fails to Investigate.**

On March 29, 2011, Godwin went to Betts in HR to complain about the ageist comments and the denial of her accommodation.  Godwin Dep. at 107-110. In response to Godwin's complaint, Betts said that Godwin should just tease Brown back about being young.  *Id*.  HR did not investigate Godwin's March 29, 2011 complaint.  Betts Dep. at 84-85.

**G.     May 4, 2011: Godwin Again Complains To HR.**

On May 4, 2011, Brown conducted the 60-day follow up with Godwin on her second PIP.  Godwin Dep. at 118 & Dep. Ex. 12; Tifft Dep. at 106-107 & Dep. Ex. 33.  In the May 4, 2011 meeting, Brown informed Godwin that she would not get the savings credit for a project that she had worked on, and another employee (Erin Massarello) would receive the savings credit instead.  Godwin Dep. at 129-

10

130.  This was Brown's decision.  Tifft Dep. at 108.  Massarello told Godwin that Brown was trying to "sabotage" her.  Godwin Dep. at 126.  A short time after the meeting, Godwin came to Brown and told Brown she had chest pains and felt like she was having a heart attack.  *Id.* at 115-116.  Brown told Godwin that she was busy and to come back later. *Id.*

That day, May 4, 2011, Godwin complained to Mary Louise Tavernaro in Human Resources about Brown.  Godwin Dep. at 116, 130; Tavernaro Dep. at 115. Godwin complained to Tavernaro instead of Betts because Betts had not taken any action in response to her previous complaint.  Godwin Dep. at 116.  Tavernaro told Godwin that she should take the next two days off, and that she would interview her on May 9, 2011.  *Id.* at 116-117.

### H.    May 9, 2011: HR Interviews Godwin And Brown Recommends, For The First Time, Godwin's Termination.

Tifft told Brown that Godwin had made an age discrimination complaint about her to Human Resources.  Brown Dep. at 38-39.  Tifft testified that Brown's reaction was "[p]robably frustration."  Tifft Dep. at 104.  Betts called Brown to schedule an interview.  Brown Dep. at 25.[7]

---

[7] Trupiano was aware of the age comments, HR complaint, and investigation prior to Godwin's termination.  Trupiano Dep. at 29-31, 47.

On May 9, 2011, Godwin interviewed with Tavernaro and Betts regarding her complaints about Brown. Godwin Dep. at 130-131. Godwin specifically complained about Brown's ageist statements, unfair treatment of her, and the denial of her accommodation. *Id.* at 84, 132-133, 136-138; Betts Dep. at 104-105, 106; Tavernaro Dep. at 72-73. Brown knew that HR was interviewing Godwin about her discrimination complaint. Brown Dep. at 108; Tavernaro Dep. at 116-117.

That day, May 9, 2011, Brown manufactured a form called a "Performance Summary," which is not a standard WellStar form, superimposed the WellStar logo on it, and recommended termination. Tifft Dep. at 113-114, 116 & Dep. Ex. 35. Brown's sudden termination recommendation was well before the scheduled conclusion of Godwin's PIP. Betts Dep. at 109-111 & Dep. Ex. 21. Brown admits that she knew about Godwin's discrimination complaint when she created the unorthodox May 9, 2011 Performance Summary. Brown Dep. at 109-110 & Dep. Ex. 32. When asked if she drafted it because of Godwin's HR complaint, she testified she "d[id] not recall." *Id*. at 112.

## I.     May 12, 2011: HR Interviews Brown; Brown Admits To Some Ageist Comments, Says She Was Trying To Provide "Options."

Betts and Tavernero interviewed Brown about Godwin's complaint on May 12, 2011. Betts Dep. at 114. In that interview, Brown admitted that she asked

Godwin her age[8] and, why she was still working as that was "past retirement age." *Id.* at 87, 115-116 & Dep. Ex. 22.  Brown further admitted telling Godwin, at her age, she would think Godwin would want to be home taking care of her husband. *Id.* at 88.  Brown told HR that she was trying to give Godwin "options."  *Id.* at 116.  Tifft agreed that a reasonable interpretation is that Brown was suggesting retirement "options."  Tifft Dep. at 120.

### J.     HR Interviews Other Employees, Concludes Investigation.

Human Resources interviewed a number of members of the purchasing department about Godwin's complaint as well.[9]  Tifft Dep. at 121; Betts Dep. at 121.  On May 20, 2011, Lynn Bryant told HR that she tries to avoid working with Brown and that Brown is "target[ing]" Godwin.  Betts Dep. at 122-124.  On May 23, 2011, June Carpenter told HR that she thought Brown was trying to get rid of her because of her age.  Betts Dep. at 125-127; Tifft Dep. at 131.  Nonetheless, that day, May 23, 2011, HR concluded the investigation, finding Godwin's complaint unjustified.  Godwin Dep. at 142-143, Betts Dep. at 128.[10]  Betts did not instruct

---

[8] In deposition, Brown denied this.  Brown Dep. at 48.

[9] Brown knew that HR was interviewing other members of her department.  Betts Dep. at 121; Brown Dep. at 118-119.

[10] Betts admitted she has never found a discrimination complaint justified.  Betts Dep. at 25.

Brown not to retaliate and did not know of "any specific steps" she took to prevent retaliation.  Betts Dep. at 131-132.

### K.   Brown Disciplines Godwin For The First Time And, Again, Recommends Termination.

On June 3, 2011, less than two weeks after the HR investigation concluded, Brown issued Godwin a First Written Notice and Warning.  Tifft Dep. at 138. Brown had never issued discipline to Godwin before her HR complaint (PIPs are not disciplinary).  *Id.* at 138-139.  At the time Brown issued this discipline, she had already decided that she wanted to terminate Godwin.  *Id.* at 139.  On June 17, 2011, two weeks later, Brown again recommended that WellStar terminate Godwin, via another dummied up "Performance Summary," complete with a company logo. Tifft Dep. at 143-144 & Dep. Ex. 39.  Brown claimed that Godwin "had a defensive posture when attempting to counsel on performance."  *Id.* at 145. This was not consistent with Tifft's experience with Godwin.  *Id.* Nor was it consistent with Brown's own previous assessment.  Months earlier, Brown stated "Mary has responded to last year's PIP with a willingness to correct poor performance."  *Id.* at 149-150, Dep. Ex. 41.

14

**L.      WellStar Terminates Godwin.**

Brown recommended to Trupiano that Godwin be terminated.[11]  Trupiano

Dep. at 44.  Trupiano claims that he was the ultimate decisionmaker.  *Id.* at 44.

However, Trupiano testified that all of the documents he reviewed regarding

Godwin's termination came from Brown.  *Id.* at 40.  He testified, "[a]t my level, I

was not dealing directly with Mary."  *Id.* at 14-15.  And he admitted that, but for

Brown's recommendation, he would not have terminated Godwin.   *Id.* at 46.

Trupiano did <u>not</u> independently verify that the information Brown gave him was

complete or accurate.

> Q.      So you did not actually conduct an independent investigation to
>         verify the completeness or accuracy of the information that Ms.
>         Brown was giving you concerning Mary Godwin, did you?
> A.      I did not.

*Id.* at 52.

WellStar claims that it fired Godwin for her purchase order errors.  Def.'s

Br. at 3, 7.  All buyers make purchase order errors.  Tifft Dep. at 89, 92.  In fact,

---

[11] Tifft had a pre-planned medical leave (to undergo surgery) in June 2011. Tifft
Dep. at 136.  Prior to Tifft's leave, Godwin told him that Brown was going to
terminate her while Tifft was out.  Godwin Dep. at 143-144.  Tifft responded, "she
better not."  *Id.*  Tifft's involvement in the termination decision was extremely
limited.  He could only recall receiving a phone call from Brown telling him they
were moving forward with the termination.  Tifft Dep. at 136-137.  Tifft said he
"wasn't in much shape to say anything" and did not do any independent
investigation to determine if Godwin's performance at the time of her termination
was subpar and "was in no shape to do that."  *Id.* at 137.

buyers make errors on a regular basis.  Brown Dep. at 63.  Buyers are not

terminated, or even disciplined, every time they make an error on a purchase order.

Tifft Dep. at 141.  Brown testified that she did not know whether Godwin made

more errors than other buyers.  Brown Dep. at 79-80.  Brown did not provide

Trupiano with information regarding purchase order errors for any other buyer and

Trupiano did not know how Godwin compared to other buyers.  Trupiano Dep. at

40-42.  Tavernaro similarly was unaware of how Godwin compared to other buyers

in terms of purchasing order errors.  Tavernaro Dep. at 78-79, 129, 147-148.  Tifft

could not say whether Godwin's purchase order errors had increased from the

period in which he evaluated her as "Meets Expectations."  Tifft Dep. at 91-92.

At Godwin's request, her co-worker, Lynn Bryant, reviewed purchase orders

for Godwin and other buyers.  Declaration of Lynn Bryant ("Bryant Decl.") at ¶ 4

(Attached as Exhibit B).  Based on her review, the frequency of purchase order

errors made by Godwin was not any greater than the frequency of errors made by

June Carpenter, Linda Durham, Ellen Quarles or Paula Arnett.  *Id.* at ¶ 5.  Ms.

Durham, Ms. Quarles and Ms. Arnett are still employed by WellStar.  *Id.*

Brown terminated Godwin on June 22, 2011.  Godwin Dep. at 143-144.  In

the termination meeting, knowing that Godwin's husband was ill, Brown

"smirked" and told Godwin that her insurance would cancel at the end of the

16

month (9 days later).  *Id.* at 144, 146-147.  Trupiano was there but did not say a

word.  *Id.* at 147; Trupiano Dep. at 52. Brown replaced Godwin with Bart

Weddington, who Tifft thinks is "in his 20s" and is substantially younger than

Godwin.  Tifft Dep. at 42-43, 47.  Mr. Weddington did not have much experience

as a buyer.  Brown Dep. at 46.

## III.    ARGUMENT AND CITATION TO AUTHORITY

"'[T]he plaintiff will always survive summary judgment if [s]he presents

circumstantial evidence that creates a triable issue concerning the employer's

discriminatory intent.'"  *Sims, Inc. v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir.

2013) (quoting *Smith v. Lockheed Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir.

2011)).  "A triable issue of fact exists 'if the record, viewed in a light most

favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence

that would allow a jury to infer intentional discrimination by the decisionmaker.'"

*Id.*

### A.    Brown's Decision Was The "But For" Cause Of Godwin's Termination.

Of paramount importance in this case is who made the termination decision.

It was Brown.  Trupiano merely signed off on Brown's recommendation, accepted

her decision, and assumed the information she provided in support was true.  Even

though WellStar now asserts that Trupiano was the decisionmaker, Godwin can

prevail under a "cat's paw theory" by demonstrating that *Brown*'s illegal animus was actually the but-for cause of Godwin's termination.  *Sims,* 704 F.3d at 1337. She must show that Brown's animus had a "determinative influence" on Godwin's termination.  *Id*. (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

WellStar attempts to evade the cat's paw by claiming that Trupiano "independently assessed Brown's recommendation to terminate" Godwin.  Def.'s Br. at 9.  Trupiano's deposition testimony belies this defense, and his testimonial admissions are, in fact, quite the opposite. Trupiano admitted that he did not directly supervise Godwin and did not regularly observe Godwin's performance. Trupiano Dep. at 14-15.  The documents Trupiano reviewed regarding Godwin came directly from Brown.  *Id*. at 40.  Trupiano did <u>not</u> independently verify that the information Brown gave him was complete or accurate.  *Id.* at 52.  Nor did Trupiano compare Godwin's performance with other buyers.  *Id.* at 40-41. Critically, <u>Trupiano admitted that he would not have terminated Godwin but-for Brown's recommendation</u>:

> Q.   I'm asking you a "but for" question.  If Cherise Brown had not come to you and recommended Ms. Godwin's termination, would you have approved her termination or would you have terminated her on your own?
>
> A.   Would I have approved? Yes. Would I have terminated her on my own? She was not a direct report, and I would not have.

*Id.* at 46.  Without Brown's recommendation, Godwin would not have been

terminated.[12]  Therefore, a reasonable jury can conclude that Brown's

recommendation, motivated by discriminatory and retaliatory animus, had a

"determinative influence" on the termination decision.

**B.  Brown's Decision Was Discriminatory And Retaliatory.**

Godwin brings claims for discriminatory and retaliatory termination under

the ADEA and retaliatory termination under the ADA.  If she establishes a *prima*

*facie* case for these claims, WellStar has the burden to articulate a legitimate

reason for her termination, which Godwin must then demonstrate is pretextual.

*Sims*, 704 F.3d at 1332, 1333.

WellStar correctly concedes Godwin can establish a *prima facie* case of

ADEA discriminatory termination, and further concedes she can establish two of

the three elements of retaliatory termination, contesting only causation.  Def.'s Br.

---

[12] The outcome in *Sims* is highly distinguishable.  In *Sims*, the Court found that the decisionmaker, in seeking out employees to terminate in a RIF, reached a decision on his own, based on his own personal observations in an independent review of the employee's performance, comparing him to other employees.  *Sims*, 704 F.3d at 1331.  One of the decisionmaker's duties was to directly review the employee's performance.  *Id.*  "It is undisputed that Perkins' own independent evaluation was that Sims was at the bottom of the list of supervisors when comparing their relative job performance."  *Id*. at 1334.  Here, there was no independent review and, admittedly, no comparison of Godwin's performance to others.

at 6, 17.  Plaintiff will first address retaliatory causation and then WellStar's

purported reason for her termination for both discrimination and retaliation claims.

### 1.   Godwin easily demonstrates causation.

WellStar contends that a reasonable jury could not find causation between

Godwin's complaint of discrimination and her termination.  At this stage, to show

causation, Godwin "need only show that the protected activity and the adverse

action were not wholly unrelated." *Brungart v. BellSouth Telecomms., Inc.*, 231

F.3d 791, 799 (11th Cir. 2000).  Close temporal proximity is "more than sufficient

to create a genuine issue of material fact of causal connection." *Martin v. Brevard

Cnty. Pub. Sch.*, 543 F.3d 1261 (11th Cir. 2008).

Here, Brown recommended termination of Godwin <u>for the first time</u> on May

9, 2011, the very day HR interviewed Godwin regarding her discrimination

complaint, five days after Godwin's complaint on May 4, 2011, and weeks before

the scheduled end of the 90-day PIP.   Godwin Dep. at 130-131; Tifft Dep. at 114;

Betts Dep. at 109-111 & Dep. Ex. 21.  Brown disciplined Godwin <u>for the first time</u>

on June 3, 2011, less than two weeks after the HR investigation and recommended

termination (again) on June 17, 2011. Tifft Dep. at 138-139, 143-144 & Dep. Ex.

39.   WellStar terminated Godwin on June 22, 2011, within two months of her

complaint and one month of the HR investigation.   Godwin Dep. at 143-144.

Relying heavily on *dicta* from *Dowlatpanah v. WellStar Health Syst., Inc.*, 2007 WL 639875 (N.D. Ga. Feb. 26, 2007), WellStar attempts to break the causal chain by arguing that Brown warned Godwin about purchase order errors before the complaint.  Def.'s Br. at 18-19.  In *Dowlatpanah*, the Court dismissed a retaliation claim for failure to exhaust administrative remedies and then noted that the plaintiff could not show causation because his supervisor had issued him a final warning before he engaged in protected speech.  *Dowlanpanah*, 2007 WL 639875, at **4-6.  The facts here are much different.  Brown had not issued Godwin a final warning, or even a first written warning, prior to her complaint.  Tifft Dep. at 138-139.  She certainly had never previously recommended termination, nor had anyone else.  There were no intervening performance problems between Godwin's complaint on May 4, 2011 and the termination recommendation on May 9, 2011.  Pursuant to HR's directive, Godwin did not even work from May 4, 2011 to May 9, 2011 and it was therefore impossible for her to create errors during that time frame.  Godwin Dep. at 116-117.   The only change that occurred in that time period was that Brown was alerted of Godwin's complaint.

### 2.    WellStar's articulated reason is pretextual.

WellStar claims it terminated Godwin for purchase order errors.  Def.'s Br. at 3, 7.  Godwin may demonstrate pretext either by showing that a discriminatory

reason more than likely motivated Brown, or by showing that the proffered reason for her termination is not worthy of belief. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537-38 (11th Cir. 1997).

WellStar's witnesses admit that all buyers made purchase order errors and buyers are not terminated, or even disciplined, every time they make an error. Tifft Dep. at 89, 92, 141; Brown Dep. at 63. Brown admitted that she did not know how many errors Godwin made compared to other buyers and Trupiano admitted that Brown did not present him with information regarding purchase order errors for other buyers. Brown Dep. at 79-80; Trupiano Dep. at 40-42. Perhaps most importantly, Tifft did not know whether Godwin's alleged errors increased from the time period in which he evaluated her as "meets expectations" (in which time period Tifft reported to Trupiano).[13] Tifft Dep. at 91-92. Godwin is her own best comparator. She was meeting expectations and given two raises in six months and then, without any discernible change in performance, was disciplined and terminated by Brown, her new (and much younger) supervisor, who decided she

---

[13] One of the least credible arguments in WellStar's brief is that the "new" management team of Trupiano, Tifft, and Brown had higher expectations for Godwin's performance than previous supervisors. Def.'s Br. at 13-14. Trupiano and Tifft were in place when Godwin was "meeting expectations." It was Tifft and Trupiano who put through her two raises. Brown, with her bias, was the only variable.

needed to be "put out to pasture."[14]   Moreover, based on Bryant's review of the

purchase order errors for Godwin and other buyers, Godwin's error frequency was

not greater than other buyers who kept their jobs.  Bryant Decl. at ¶ 5.

### 3.   Additional evidence of discriminatory animus.

The record provides ample material for a full and colorful mosaic of age

discrimination.  In addition to the inconsistency in WellStar's articulated reason,

Brown (in her 30s) replaced Godwin with a less experienced employee in his 20s.

Tifft Dep. at 42-43, 47; Brown Dep. at 46.   There is also the full panoply of

Brown's age-based remarks, including: (1) her express question to Godwin

regarding her age with follow-up regarding why she is working at her age; (2)

statement that she should have planned for her retirement when she was younger;

(3) statement that, at her age, she should be at home taking care of her husband; (4)

the "put out to pasture" comment; and (5) the repeated and cruel implications of

mental deficiencies.  WellStar's assertions that these remarks "in no way suggest

that Brown thought Plaintiff was too old to be working" and that she was merely

expressing "frustration with people who do not plan for retirement," are absurd and

---

[14] Intelligently toeing the company line, Tifft now says he agreed with Godwin's termination. A jury could choose to credit, however, Tifft's contemporaneous statement to Godwin that Brown "better not" terminate her when he was out, and conclude that Tifft actually disagreed with the termination.  Godwin Dep. at 143-144.

require that common sense not only be suspended, but that it be drawn and quartered.

Brown's discriminatory comments are apt circumstantial evidence of animus. *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1203-04 (11th Cir. 2010) (reversing summary judgment when supervisor was alleged to have made statements including: "I need someone younger," "you are very old, you are very inept," "what you should be doing is taking care of old people," and that the employee was "too old to be working"); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) (decisionmaker's statement that he wanted "aggressive, young men" was "highly suggestive circumstantial evidence"); *Wright v. Southland Corp.*, 187 F.3d 1287, 1304-05 (11th Cir. 1999) (statement that employee "may be getting too old to understand the store's new computer programs" was evidence of discriminatory animus); *Harris v. CVS Caremark Corp.*, 2013 WL 365259, at *8 (N.D.Ala. Jan. 29, 2013) (jury could infer age-related bias when decisionmaker asked plaintiff when he was going to retire and how old he was, even when comments were distant in time from decision); *Bonham v. Regions Mortg., Inc.*, 129 F.Supp.2d 1315, 1325 (M.D. Ala. 2001) (supervisor's comment that employee was "getting real old" evidence of "general bias").

### 4. Additional evidence of retaliatory animus.

With respect to Godwin's ADEA and ADA retaliation claims, timing is everything. Prior to Godwin's HR complaint, Brown had never recommended that she be terminated, and had never even issued her written discipline. When Brown learned that Godwin had complained about her to HR, her reaction that day, on May 9, 2011, was to recommend termination. It is simply not plausible that between May 4 and May 9, 2011, Godwin's performance plummeted to such an extent that Brown had to immediately proceed with termination. Godwin was not even working during that time. Further, the first termination recommendation was weeks before the scheduled end of the PIP.[15] Then, less than two weeks after the HR investigation was concluded, Brown disciplined Godwin for the first time (clearly papering the file as she had already decided to terminate her) and her termination quickly followed. A jury could easily conclude that Brown's strikingly sudden decision that she could not tolerate Godwin any longer, before the expiration of the PIP, was not based on what WellStar describes as "largely just typographic or data entry errors," (Def.'s Br. at 14) but rather Godwin's HR complaint.

---

[15] Deviation from corporate policy can be evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("an employer's deviation from its own standard procedures may serve as evidence of pretext").

**C.    Brown Willfully Denied Godwin A Reasonable Accommodation For Her Disability.**

**1.    Godwin is a qualified individual with a disability.**

One of the primary intents of the 2008 ADA amendments was to eliminate arguments such as WellStar's current contention that Godwin does not qualify as "disabled."  29 C.F.R. § 1630.1(c)(4) ("[T]he definition of 'disability' in this part shall be construed broadly in favor of expansive coverage …").

A disability is physical or mental impairment that substantially limits one or more major life activities.  29 C.F.R. § 1630.2(g)(1)(i).  Physical impairments are any "physiological disorder or condition" "affecting one or more body systems," including musculoskeletal.  *Id*. at § 1630.2(h)(1).  Major life activities include: walking, standing, sitting, lifting, and bending.  *Id*. at § 1630.2(i)(1)(i).  Whether a disability substantially limits a major life activity "is not meant to be a demanding standard" and the analysis is whether "it substantially limits the ability to perform a major life activity as compared to most people…"  *Id*. at 1630.2(j)(1)(i)-(ii).

Godwin's rheumatoid arthritis, osteoporosis and fibromyalgia substantially limit the major life activities of walking, standing, sitting, lifting and bending. Godwin Decl. at ¶¶ 8-12.  Most significantly, Godwin cannot sit for more than an hour at a time without excruciating pain and swelling.  Godwin Dep. at 78, 80-81, 154-155, 180, Dep. Ex. 10; Tifft Dep. at 79 & Dep. Ex. 27; Brown Dep. at 61, 82-

26

83.  In a letter Godwin hand-delivered, her doctor informed WellStar expressly that, because of this substantial limitation, Godwin was not to remain sedentary for more than an hour at a time.   Godwin Dep. at 80-81 & Dep. Ex. 10; Tifft Dep. at 79 & Dep. Ex. 27; Brown Dep. at 61, 82-83.  Godwin is "disabled" and enjoys the protection of the ADA.  *Scavetta v. King Soopers, Inc.*, 2013 WL 316019, at *2 (D. Colo. Jan. 28, 2013) (recognizing rheumatoid arthritis as a disability and finding that it "causes pain, swelling, stiffness, and damage to the joints" in attacking the "muscular-skeletal system" and "impeding the movement and function of joints").

### 2.    Godwin was denied a reasonable accommodation.

"It is unlawful for a covered entity not to make reasonable accommodation to the known physical … limitations of an otherwise qualified … employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  29 C.F.R. § 1630.9(a); 42 U.S.C.A. § 12112(5)(A).  An employer's obligation to accommodate is triggered by an employee's request for a reasonable accommodation. *Williamson v. Clarke Cnty. Dep't of Human Res.*, 834 F.Supp.2d 1310, 1319-20 (S.D. Ala. 2011).  If a disabled employee requests a reasonable accommodation, the employer's only defense to not providing it is the affirmative defense of undue burden.  *Nadler v. Harvey*, 2007 WL 2404705, at *9 (11th Cir. Aug. 24, 2007)

27

("Once a plaintiff has shown that he is an otherwise qualified disabled individual within the meaning of the Act and that a defendant has not provided a reasonable accommodation, a defendant must provide a reasonable accommodation unless he can assert an undue burden as an affirmative defense.").

Godwin clearly requested a reasonable accommodation: that she be permitted to stand up and walk once an hour.  Brown conceded that, if Godwin gave her the doctor's note, it constituted a request for an accommodation related to her disability.  Brown Dep. at 82-83.  Betts admitted that Godwin's request was reasonable.[16]  Betts Dep. at 72.  Brown, however, would not allow it, telling Godwin that she could not get up, or even go to the restroom without permission, that she "just deal with it" if Brown was not around to give permission, and sometimes denying that permission.   Godwin Dep. at 83, 85-87, 90, 94-98, 180.  Brown's denial caused excruciating pain and bodily swelling requiring cortisone shots.  *Id.* at 154-155, 180.[17]

In what is intended as a "gotcha" moment, WellStar points to Brown's testimony that Godwin did not leave the room during her deposition.  Godwin's

---

[16] Defendant does not argue that Godwin's request was an undue burden.

[17] There is a material factual dispute regarding this claim in that Godwin claims that her walks only took her away from her desk for approximately 5 minutes, whereas Brown alleged Godwin was regularly absent for "over 45 minutes." Godwin Dep. at 82, 87; Brown Dep. at 85.

determination to fight through pain for a couple hours to see her attorney cross-examine the person who abused her, fired her from a company that had employed her for over a decade, and stripped away insurance for her and her dying husband does not excuse WellStar's failure to accommodate her.  WellStar willfully failed to provide the reasonable accommodation that Godwin requested and therefore violated the ADA.

## IV.    CONCLUSION

This case is the classic case of "but for" causation under the ADEA.  But for Brown's stated bias against older workers and against Godwin in particular because of her age, Godwin would not have been terminated.  But for Brown's biased recommendation to upper management, Godwin would not have been terminated.  Upper management admittedly failed to conduct any independent investigation of Godwin's alleged deficiencies.  Upper management failed to compare Godwin's performance to her peers.  Indeed, neither Brown nor upper management can verify that Godwin's performance was worse or better than her peers.

In short, upper management was a merely a conduit through which Brown channeled her discriminatory and retaliatory bias.  It was at best a rubber stamp, demonstrated aptly when Brown stamped "WellStar" on the faked "Performance

Summaries" she concocted to recommend Godwin's termination before WellStar's established 90 day PIP had run its course.  Brown, who "could not recall" whether she wrote her termination recommendation because she knew Godwin was complaining that very day of discrimination, was the *de facto* decisionmaker.

Finally, Brown, by her own admission, failed to ever try to accommodate Godwin's disability, even after Godwin gave her a note from her doctor verifying her need to not sit for more than an hour at a time.  Brown admits she took no steps to accommodate Godwin's disability (Brown Dep. at 83).  She instead told Godwin to just "deal with it."  Looking at Godwin's testimony, coupled with the admissions of the Defendants, issues of material fact exist for trial.  Summary judgment should be denied.

Respectfully submitted, this 22nd day of August, 2013

*/s/ Justin M. Scott*
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com
Justin M. Scott
Georgia Bar No. 557463
jmscott@buckleyklein.com

BUCKLEY & KLEIN, LLP
Promenade II, Suite 900
1230 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone:  (404) 781-1100
Facsimile:  (404) 781-1101
Attorneys for Plaintiff

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as approved by the Court in LR 5.1B.

BUCKLEY & KLEIN, LLP


*/s/ Justin M. Scott*
Counsel for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MARY GODWIN, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. 1:12-cv-03752-WSD |
| v. | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| WELLSTAR HEALTH | ) | |
| SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 22, 2013, I electronically filed **Plaintiff's**

**Response in Opposition to Defendant's Motion for Summary Judgment** with

the Clerk of the Court using the CM/ECF system which will automatically send e-

mail notification of such filing to the following attorneys of record:

Charles L. Bachman
Lauren A. Nations


*/s/ Justin M. Scott*
Counsel for Plaintiff

32