## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MARY GODWIN,

                **Plaintiff,**

      v.

WELLSTAR HEALTH
SYSTEM, INC.,

                **Defendant.**

             **1:12-cv-3752-WSD**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [30].

## I.     BACKGROUND

     A.    <u>Procedural History</u>

On October 26, 2012, Plaintiff Mary Godwin ("Plaintiff") filed this employment discrimination action against her former employer Defendant WellStar Health Systems, Inc. ("Defendant" or "WellStar").  In her Complaint, Plaintiff asserts four causes of action: that Defendant terminated Plaintiff's employment because of her age, in violation of the Age Discrimination in Employment Act ("ADEA") (Count I); that Defendant terminated Plaintiff's employment in retaliation for Plaintiff's complaints about age discrimination, in

violation of the ADEA (Count II); that Defendant failed to accommodate Plaintiff's disability, in violation of the Americans with Disabilities Act ("ADA") (Count III); and that Defendant terminated Plaintiff's employment in retaliation for Plaintiff's complaints about the failure to accommodate her disability, in violation of the ADA (Count IV).  On July 29, 2013, Defendant filed its Motion for Summary Judgment on all of Plaintiff's claims.

B.    Relevant Factual Background[1]

Plaintiff was born in August 1948.  (Resp. SUMF [42] ¶ 5.)  She began working for WellStar, a system of hospitals and other healthcare facilities, in May 1999, as an order puller in Defendant's Distribution Center.  (Id. ¶ 4; SAMF [43] ¶¶ 2–3.)  By 2003, Plaintiff had been promoted to the position of Buyer, first in WellStar's Distribution Center and later in WellStar's Purchasing Department. (Resp. SUMF [42] ¶¶ 10–11, 20; SAMF [43] ¶¶ 3–4.)  As a Buyer, Plaintiff's

---

[1] These facts are taken from the following statements of facts submitted in accordance with Local Civil Rule 56.1: Defendant's Statement of Undisputed Material Facts [30-2] ("SUMF"), Plaintiff's Response to Defendant's SUMF [42] ("Resp. SUMF"), Plaintiff's Statement of Additional Material Facts [43] ("SAMF"), and Defendant's Response to Plaintiff's SAMF [47] ("Resp. SAMF"). Where a party disputed a factual assertion contained in a statement of facts, the Court also considered the specific exhibits cited in support of the assertion.  See LR 56.1(B)(3), NDGa (providing that the court deems a party's SUMF citation as supportive of the asserted fact "unless the respondent specifically informs the court to the contrary in the response").

duties included processing orders, with outside vendors, for goods made by various departments within WellStar's enterprise.  (<u>See</u> Resp. SUMF [42] ¶¶ 13–14.)

In March 2009, WellStar hired Tony Trupiano ("Trupiano") as its Vice President of Supply Chain.  (<u>Id.</u> ¶ 46.)  Trupiano's responsibilities included overseeing the Purchasing Department.  (<u>Id.</u> ¶ 47.)  At the time Trupiano joined WellStar, the Manager of the Purchasing Department, and Plaintiff's direct supervisor, was Chris Holihan ("Holihan").  (<u>See</u> <u>id.</u> ¶ 49.)  Holihan expressed concerns to Trupiano regarding Plaintiff's performance, including errors in purchase orders.  (<u>Id.</u> ¶ 50.)

In September 2009, Holihan conducted an evaluation of Plaintiff in which he rated Plaintiff's performance as "below expectations."  (<u>Id.</u> ¶¶ 43–44.)  In October 2009, WellStar hired Ken Tifft ("Tifft") as its Director of Purchasing and Contracts, a new position reporting to Trupiano, the Vice President of Supply Chain, and overseeing Holihan, the Purchasing Department Manager.  (<u>See</u> <u>id.</u> ¶¶ 56, 58; SAMF [43] ¶ 18.)  Tifft reviewed Holihan's evaluation of Plaintiff. (Resp. SUMF [42] ¶ 59.)  Tifft stated that, while he did not have reason to disbelieve Holihan's evaluation, he believed Holihan's criticisms lacked sufficient

documentation.  (Id. ¶¶ 60–61.)[2]  Tifft therefore approved a merit pay raise for Plaintiff.  (Id.)

In October 2009, Holihan left WellStar, and Tifft assumed temporary day-to-day management over the Purchasing Department.  (Id. ¶¶ 57–58; SAMF [43] ¶ 19.)  In March 2010, Tifft conducted an evaluation of Plaintiff in which he rated Plaintiff's performance as "below expectations."  (Resp. SUMF [42] ¶¶ 62, 64.)[3]

In April 2010, WellStar hired Cherise Brown ("Brown") as the Manager of the Purchasing Department, and Brown became Plaintiff's direct supervisor.  (Id. ¶ 76.)  In July 2010, Brown and Tifft jointly conducted an evaluation of Plaintiff in which they rated Plaintiff's performance as "below expectations."  (Id. ¶¶ 80–82, 84.)

In September 2010, Brown placed Plaintiff on a 90-day "performance improvement plan" ("PIP").  (Id. ¶¶ 85–86; SAMF [43] ¶ 28.)  The PIP identified several deficiencies in Plaintiff's performance, including making errors on

---

[2] Plaintiff purports to dispute the fact that Tifft did not disbelieve Holihan's review because, in April 2010, Tifft wrote in an email that Plaintiff was "meeting expectations."  (Resp. SUMF [42] ¶ 60.)  Tifft's April 2010 email does not show Tifft's beliefs in October 2009.

[3] In April 2010, the month after the March 2010 evaluation, Tifft determined that Plaintiff was meeting expectations, and he approved a substantial pay raise for Plaintiff to bring her pay in line with that of other Buyers in the Purchasing Department.  (Resp. SUMF [42] ¶¶ 71–74.)

purchase orders.  (Resp. SUMF [42] ¶ 86.)  Brown presented Plaintiff with formal follow-ups to the PIP after 30 and 60 days.  (Id. ¶¶ 88–91.)  In these follow-ups, Brown noted improvements in some areas and continued concerns in others.  (Id.)[4]

In January or February 2011, Brown conducted an evaluation of Plaintiff in which she rated Plaintiff as not meeting expectations.  (Id. ¶ 93.)  In late February 2011, Brown placed Plaintiff on a second 90-day PIP.  (Id. ¶ 94.)  This PIP identified deficiencies similar to those in the earlier PIP, including errors on purchase orders.  (Id. ¶ 95.)

On February 25, 2011, Plaintiff presented Brown with a note from her physician stating that, "[b]ecause of rheumatoid arthritis, [Plaintiff] should not remain seated/sedentary for more than one hour continuously."  (Id. ¶ 97.)  Plaintiff explained to Brown that she needed to move around every hour.  (Id. ¶ 99.)  Brown responded by telling Plaintiff that she needed to remain "visible" in the Purchasing Department.  (Id. ¶ 101.)[5]  The Purchasing Department was sufficiently large to allow Plaintiff to walk.  (Id. ¶ 105.)

---

[4] Brown did not provide a follow-up after 90 days because she decided to wait until Plaintiff's mid-year evaluation.  (Resp. SUMF [42] ¶ 92.)

[5] Plaintiff asserts that Brown told her that she needed to obtain Brown's permission before leaving her desk and before using the restroom.  (SAMF [43] ¶ 70.)  Plaintiff also asserts that there were occasions when Brown denied Plaintiff permission to leave her desk or to use the restroom.  (Id. ¶ 73; Resp. SUMF [42]

In March 2011, Plaintiff complained to WellStar's Human Resources Department that Brown had made "ageist" comments to her and that Brown was not accommodating her need to walk.[6]  (SAMF [43] ¶ 86.)

On May 4, 2011, Brown gave Plaintiff a 60-day follow-up to the second PIP, which noted continued performance deficiencies.  (Resp. SUMF [42] ¶¶ 114–15.) On the same day, Plaintiff requested a meeting with WellStar's Human Resources Department to discuss her earlier complaints about Brown.  (SAMF [43] ¶¶ 95–97.)  On May 9, 2011, the Human Resources Department interviewed Plaintiff, who reported on Brown's alleged "ageist" comments and failure to accommodate Plaintiff's arthritis.  (Id. ¶¶ 102–03.)[7]

---

¶ 102.)  The record does not show that Brown ever denied Plaintiff permission to walk at least once per hour.

[6] At some point after becoming Manager of the Purchasing Department, Brown allegedly made numerous comments to Plaintiff that Plaintiff characterizes as "ageist."  These comments, most of which Defendant disputes were made, include: Brown stating that Plaintiff was not "mentally capable of understanding" Brown (SAMF [43] ¶ 37); Brown asking Plaintiff her age and then asking, "At your age, why are you still working?" (id. ¶¶ 39–40); Brown telling Plaintiff that she "should have made provision for being out of work when she was young" (id. ¶ 42); Brown telling Plaintiff that, at her age, she should be "home taking care of her husband" (id. ¶ 43); and Brown stating that it was time for Plaintiff to be "put out to pasture" (id. ¶ 44).

[7] Brown was aware that Plaintiff had lodged her complaints with Human Resources and that Plaintiff was meeting with Human Resources on May 9, 2011.  (SAMF [43] ¶ 104.)  On the same day as the meeting, Brown drafted a document

Beginning in June 2011, while Trifft was on medical leave, Brown had weekly meetings with Trupiano to discuss the performance of the employees in the Purchasing Department.  (Resp. SUMF [42] ¶ 167.)  During one of these meetings, Brown recommended to Trupiano that Plaintiff be fired because of Plaintiff's continued performance issues.  (Id. ¶ 168.)  Brown gave Trupiano several recent purchase orders completed by Plaintiff that contained errors.  (Id. ¶ 174; SAMF [43] ¶ 137.)

Trupiano reviewed the purchase orders supplied by Brown and determined that Plaintiff's errors were occurring at an "unacceptable frequency."  (Resp. SUMF [42] ¶ 174.)  Trupiano testified that, based on his review of the purchase orders, earlier complaints he had received about Plaintiff from Holihan and Trifft, and his knowledge that Plaintiff had been given earlier warnings about her performance before making the errors on the exemplar purchasing orders, he decided to terminate Plaintiff's employment.  (Id. ¶ 175.)  On June 22, 2011, Plaintiff was fired from WellStar in a meeting with Trupiano, Brown, and a Human Resources employee.  (Id. ¶ 193.)

---

recommending Plaintiff's termination.  (Id. ¶ 106.)  The record does not show that Brown ever transmitted this document to anyone.

## II.    DISCUSSION

### A.    Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party

opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Analysis

1.    *Counts I, II, and IV of Plaintiff's Complaint*

The ADEA prohibits an employer from discriminating against an employee "because of" age or "because" an employee has complained about age discrimination. See 29 U.S.C. § 623(a)(1), (d). The ADA prohibits an employer from discriminating against an employee "because" the employee has complained about a failure to reasonably accommodate the employee's disability. See 42 U.S.C. § 12203(a). In Counts I, II, and IV of her Complaint, Plaintiff alleges that Defendant violated these provisions by firing her because of her age and because

she had previously complained about her supervisor Brown's acts of age

discrimination and failure to accommodate Plaintiff's rheumatoid arthritis.

Defendant argues that it is entitled to summary judgment on Counts I, II, and

IV because the decision to fire Plaintiff was made by Trupiano, who did not harbor

any illegal animus toward Plaintiff.  Plaintiff does not dispute that Trupiano lacked

a discriminatory animus or that Trupiano made the formal firing decision.  Plaintiff

argues that Defendant is liable because Trupiano acted merely as the "cat's paw"

of Plaintiff's direct supervisor Brown, who Plaintiff contends did harbor

discriminatory animus toward Plaintiff.

Under the subordinate bias, or "cat's paw," theory of liability in employment

discrimination cases, the illegal animus of a supervisor who was not the decision

maker with respect to an adverse employment action may nevertheless be imputed

to the employer.  Sims v. MVM, Inc., 704 F.3d 1327, 1335 n.6 (11th Cir. 2013).

For the theory to apply in ADEA cases and ADA retaliation cases, the biased

supervisor's animus must be "a 'but-for' cause of, or a determinative influence

on," the employer's ultimate decision.  Id. at 1337.[8]  This requires a showing that

---

[8] The parties do not dispute that the same "but-for" causation standard applies to
both ADEA claims and ADA retaliation claims.  The Court agrees.  In Sims, the
Eleventh Circuit held that the "but-for" standard applies in ADEA discrimination
claims because the statute prohibits discrimination "because of" an employee's
age.  See 704 F.3d at 1335–36.  Both the ADEA and ADA retaliation provisions

the decision maker merely "rubberstamped" the biased supervisor's recommendation, applying the adverse action without any independent investigation.  See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999); see also Simmons v. Sykes Enters., Inc., 647 F.3d 943, 950 (10th Cir. 2011), cited with approval in Sims, 704 F.3d at 1336.

In this case, Brown recommended to Trupiano that Plaintiff be fired.  Brown told Trupiano that the basis for her recommendation was that Plaintiff continued to make errors on purchasing orders.  Brown provided Trupiano with exemplar purchasing orders showing Plaintiff's alleged errors.  Trupiano testified that he personally reviewed the exemplar purchasing orders and determined that Plaintiff's errors were "occurring at an unacceptable frequency."  Trupiano further testified that, based on his review of the purchasing orders, the fact that Plaintiff had been given earlier warnings about her performance before making the errors on the exemplar purchasing orders, and his knowledge concerning earlier complaints

include similar "because" language.  See 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . *because* such individual . . . has opposed any practice made unlawful by this section . . . ." (emphasis added)); 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual *because* such individual has opposed any act or practice made unlawful by this chapter . . . ." (emphasis added)); see also Univ. of Tex. Sw. v. Nassar, 133 S. Ct. 2517, 2528 (2013) (holding that the use of "because" in Title VII's retaliation provision creates a "but-for" causation standard in Title VII retaliation claims).

about Plaintiff, he decided to terminate Plaintiff's employment.[9]

The record does not support that Trupiano merely "rubberstamped" Brown's recommendation.  He personally reviewed the exemplar purchasing orders and independently determined that the errors shown in them were "unacceptable."[10] Trupiano determined that the errors, in conjunction with his personal knowledge of Plaintiff's prior performance issues, were sufficient to warrant Plaintiff's termination.  See Simmons, 647 F.3d at 950 ("[W]here a violation of company policy was reported through channels independent from the biased supervisor, or the undisputed evidence in the record supports the employer's assertion that it fired the employee for its own unbiased reasons that were sufficient in themselves to justify termination, the plaintiff's age may very well have been in play—and could even bear some direct relationship to the termination if, for instance, the biased

_____

[9] Trupiano testified that his decision was based on these factors.  Although Trupiano stated that he considered *whether* to terminate Plaintiff because of Brown's recommendation, Trupiano did not testify, and the record does not otherwise show, that Brown's recommendation was a factor in the decision itself.

[10] Plaintiff argues that Trupiano's review of the purchasing orders was not "independent" because Brown provided Trupiano with the purchasing orders. Plaintiff, however, does not dispute the authenticity of the orders, or that they contained the errors alleged, and Plaintiff has not submitted any evidence to show that Trupiano did not independently determine that the errors were "unacceptable." See Simmons, 647 F.3d at 950 (explaining that cat's paw liability would attach if the decision maker relied on *false* reports of employee misconduct).

supervisor participated in the investigation or recommended termination—but age was not a determinative cause of the employer's final decision.")[11]  The record does not support that Trupiano was the "cat's paw" of Brown, and Defendant is entitled to summary judgment on Counts I, II, and IV of Plaintiff's Complaint.

### 2.   *Count III of Plaintiff's Complaint*

The ADA generally requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee."  42 U.S.C § 12112(b)(5)(A).  In Count III of her Complaint, Plaintiff alleges that Defendant violated this provision because Brown failed to accommodate Plaintiff's rheumatoid arthritis.  Plaintiff specifically alleges that Brown denied her permission to stand and walk once per hour.  Defendant disputes that Brown denied Plaintiff permission to stand and walk once per hour.

The record shows that Plaintiff made her request for accommodation by presenting to Brown a note from Plaintiff's physician stating that, due to

---

[11] Plaintiff argues that Trupiano did not compare Plaintiff's errors to those of other employees in the Purchasing Department.  Plaintiff does not cite, and the Court is not aware of, any authority requiring such a comparison.  Plaintiff concedes that Trupiano did not have an illegal animus toward her, and the record supports that Trupiano believed Plaintiff's errors, in conjunction with Plaintiff's prior work history, were sufficient to fire Plaintiff.

rheumatoid arthritis, Plaintiff should not remain seated for more than one hour. Plaintiff explained to Brown that her condition required her to move once per hour. In response to Plaintiff's request, Brown responded that Plaintiff needed to remain "visible" within the Purchasing Department.[12]

Plaintiff argues that Brown required Plaintiff to seek Brown's permission before getting up from her desk and that Brown occasionally denied Plaintiff's requests to get up. The record does not contain any evidence, however, that Brown ever denied Plaintiff permission to walk at least once per hour, or otherwise prevented Plaintiff from walking at least once per hour—the accommodation requested by Plaintiff and at issue in this case.[13] The record thus does not support that Plaintiff was denied an accommodation, and Defendant is entitled to summary judgment on Count III of Plaintiff's Complaint.

---

[12] There is no dispute that the Purchasing Department is large enough to accommodate Plaintiff's walks.

[13] Plaintiff also argues that Brown occasionally denied Plaintiff permission to use the restroom. Use of the restroom, however, was not an accommodation requested by Plaintiff, and Plaintiff has not argued here that unfettered use of the restroom was necessary to accommodate Plaintiff's rheumatoid arthritis. See, e.g., Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) ("An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability.")

### III.      CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment [30] is **GRANTED**.

**SO ORDERED** this 27th day of March, 2014.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE